UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILLIAM SHELTON,<br><br>                    Plaintiff,<br><br>        v.<br><br>BRENT REINKE, DARCELL STAMMER, SGT. B. GUNN, OLIVIA CRAVEN, MARK FUNAIOLE, JANIE DRESSEN, NORMAN LANGERAK, MIKE MATTHEWS, and BILL YOUNG, in their official capacities, TEREMA CARLIN, ERIC MACEACHERN, MR. MUNDEN, MS. ANDERSON, JENNY RUPPEL, MR. ALDRIN, MS. ROAN, MS. FUDGE, FRED FOWLER, and LYLE GEHRKE, individually and in their official capacities,<br><br>                    Defendants. | Case No. 3:11-cv-00064-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are: (1) Defendants' Motion for Summary Judgment (Dkt. 19); (2) Defendants' Motion to Strike (Dkt. 25) portions of Plaintiff's response to the Motion for Summary Judgment; (3) Plaintiff's Motion to Strike (Dkt. 29) all the affidavits submitted in support of Defendants' Motion for Summary Judgment; (4) Plaintiff's Motion to Compel Production of Supplemental Documents and Supporting

**MEMORANDUM DECISION AND ORDER - 1**

Memorandum and Affidavit (Motion to Compel) (Dkt. 36); and (5) Plaintiff's Objection and Motion to Strike and Supporting Memorandum and Affidavit (Dkt. 42) regarding Defendant Terema Carlin's Supplemental Affidavit. The Court finds that the decisional process would not be aided by oral argument. After reviewing the record and the arguments of the parties, the Court enters the following Order addressing all pending motions.

## BACKGROUND

Plaintiff William Shelton, an inmate, asserts that Defendants failed to protect him when he was housed in the protective custody unit (PC Unit) at the Idaho Correctional Institution at Orofino (ICI-O). His claims arise from an incident in which he was assaulted on June 2, 2010 by his cellmate, Richard Dee Williams.

After Plaintiff filed his Complaint, United States Magistrate Judge Ronald E. Bush issued an Initial Review Order, permitting Plaintiff to proceed on an Eighth Amendment failure-to-protect claim against Defendants Brent Reinke, Darcell Stammer, Sergeant B. Gunn, Terema Carlin, Eric MacEachern, Mr. Munden, Ms. Anderson, Jenny Ruppel, Mr. Alldrin, Ms. Roan, Ms. Fudge, Fred Fowler, and Lyle Gehrke. (Dkt. 6.)

Defendants' pending Motion for Summary Judgment seeks dismissal of all remaining claims against all remaining Defendants on grounds that Defendants' actions and decisions did not violate Plaintiff's Eighth Amendment right to personal safety, that the Eleventh Amendment bars claims for damages against Defendants in their official capacities, that respondeat superior is not a viable theory under § 1983, and that qualified

**MEMORANDUM DECISION AND ORDER - 2**

immunity applies. (Dkt. 19.)

Also pending is Defendants' Motion to Strike portions of Plaintiff's responsive pleadings (Dkt. 25), and Plaintiff's Cross-Motion to Strike all of the affidavits filed in support of Defendants' Motion for Summary Judgment. (Dkt. 29.)

On November 5, 2012, the Court entered an Order that resolved various pending discovery motions, ordering Defendants to produce (1) documents "related to inmate-on-inmate assaults in the PC Unit during the period June 2, 2009 through June 2, 2010"; (2) reports and other written documents related to assaults in the PC Unit that were generated or received between June 1, 2009 and June 1, 2010; and (3) criminal records, institutional behavior history, and Restrictive Housing Hearing reports for prisoner Richard Dee Williams since January 1, 2008 (Dkt. 35, pp.15-20.) Once those documents were produced, the parties were ordered to file supplemental pleadings to the Motion for Summary Judgment. (*Id.*, p.22.)

After Defendants produced the documents as ordered, Plaintiff filed a Motion to Compel, requesting supplemental documents. (Dkt. 36.) He also filed a Motion to Strike the Supplemental Affidavit of Terema Carlin (Dkt. 40), which he asserts stands in opposition to her statements in her first Affidavit. (Dkt 42.)

The Court will first address Defendants' Motion for Summary Judgment, then the three Motions to Strike, and finally Plaintiff's Motion to Compel.

**MEMORANDUM DECISION AND ORDER - 3**

**DISCUSSION**

**1. Defendants' Motion for Summary Judgment**

    **A. *Standard of Law***

    Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

    "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The requirement is that there be no *genuine* dispute as to any *material* fact. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the

record, or show that the adverse party is unable to produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

**MEMORANDUM DECISION AND ORDER - 5**

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

### B. *Undisputed Facts*

This section includes facts that are undisputed and material to the resolution of the issues in this case.  Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as the version is not contradicted by clear documentary evidence in the record.

The Protective Custody (PC) Unit at ICI-O is designed to provide safe housing for inmates in need of protection; while it is not 100 percent safe, the prison has implemented various policies and procedures to keep it as safe as reasonably possible. (Dkt. 19-3, p.2.) The PC Unit includes Level 1 and Level 2, where inmates are housed in double-occupancy cells. (*Id.*) Level 1 is more restrictive however, because only four inmates are allowed in the common area (dayroom) at once; in Level 2, up to 32 inmates may be in the dayroom at once. (*Id.*)

IDOC policy provides that, when an inmate arrives at the PC Unit, IDOC employees investigate the inmate and have a screening hearing to determine where the inmate can be safely housed. (*Id.*, p.3.) Inmates are temporarily housed in Level 1 until

**MEMORANDUM DECISION AND ORDER - 6**

the investigation is complete. If an inmate can be safely housed with a cellmate and have frequent contact with other prisoners, the inmate is transferred to Level 2. (*Id.*) If IDOC employees determine that an inmate poses a threat to the safety of the other PC inmates, the inmate is removed from Level 2 and placed in segregation, which is a separate prison unit where inmates who are a threat to property, self, staff or other offenders are housed in single cells. (*Id.*) An inmate's placement in the PC Unit is reviewed by the Restrictive Housing Review Committee every 30 days for the first 90 days, and then every 90 to 120 days thereafter. (*Id.*)

To maintain safety in the facility, ICI-O policy requires correctional officers to perform hourly checks of each cell and the common areas, as well as six official inmate counts each day. (*Id.*, p.6.) A control room that looks out over Level 2 is manned 24 hours a day and has real time video surveillance of the Level 2 dayroom, cell doors and hallway. (*Id.*) Furthermore, each cell is equipped with an emergency button, and officers usually respond if the button is pressed several times. (*Id.*, pp.6-7; Dkt. 23, p. 4.)

If an inmate in the PC Unit has a conflict with another inmate or fears for his safety, he may submit a written concern form or speak directly to a correctional officer. Both types of reporting are documented in the inmates "C-notes" pursuant to IDOC policy. (*Id.*, p.7.)

Prison records show that, between June 1, 2009 and June 1, 2010 (the day before Plaintiff was assaulted), there were nine recorded inmate-on-inmate assaults in the PC Unit. (Dkt. 40, p.2.) Of those nine recorded assaults, only one was classified as an

**MEMORANDUM DECISION AND ORDER - 7**

aggravated battery that resulted in visible, moderate injuries to an inmate. (*See* Dkt. 37-7, pp. 2-32.) Four of the assaults were reported to be mutual combat between inmates. (*See* Dkts. 37-1, 37-8, 37-9, 37-10, 37-11, 37-12.) The remaining four reported assaults involved one inmate hitting, pushing or punching another inmate with minimal or no injuries involved. (*See* Dkts. 37-3, 37-4, 37-5, 37-6.)

Plaintiff was transferred to the PC Unit at ICI-O and was assigned to Level 2 in September 2008. Inmate Richard Dee Williams (Williams) was transferred to the PC Unit at ICI-O in November 2009, and assigned to Level 2 in December 2009. (Dkt. 19-3, pp.4-5.)

To determine Williams' initial placement in the PC Unit in November 2009, the Restrictive Housing Review Committee reviewed the following records: (1) on June 23, 2008, Williams was given a Segregation Housing Order at Idaho Correctional Center for fighting, but there are no details provided as to whether Williams was the aggressor or the victim (Dkt. 37-15, p.2); and (2) between June 19, 2007 and June 17, 2009, Williams' Reclassification Score Sheets indicate he received no Disciplinary Offense Reports (DORs) in that two-year time frame (Dkt. 37-15, pp.4,6; *see also* Dkt. 19-6, p.4.)

Then in November and December 2009 (about six months prior to the assault on Plaintiff), Williams did not want to be housed in Level 2 because he did not want to be in a cell with another inmate for 23 hours a day. He received four administrative DORs for disobeying ICI-O correctional officers' orders to move cells. (Dkt. 40-1.) Williams then requested that he be transferred out of the PC Unit and into the administrative

MEMORANDUM DECISION AND ORDER - 8

segregation unit. His four DORs were reviewed as part of his request to be moved out of the PC unit. (Dkt. 40, p.3.) Because the DORs "did not involve any assault, battery, and/or violence on the part of Inmate Williams," the Restrictive Housing Placement Committee did not believe Williams posed a threat to his safety or the safety of other inmates, so the Committee determined Williams should remain in the PC Unit. (*Id.*, pp.3-4.) Williams' placement in the PC Unit was reviewed six different times between November 2009 and May 2010 (just one month before the assault). (Dkt. 19-2, p.5.)

In February 2010, Defendant Alldrin, a Correctional Officer at ICI-O, assigned Plaintiff to be Williams' cellmate. (Dkt. 19-10, p.2.) Plaintiff states that when he agreed to move to 205A so that Inmate Jimison could move into 207A, Alldrin warned him that Richard Williams was "impossible to get along with for very long." (Dkt. 37-13, p.2.) Plaintiff also states that Alldrin said that Williams "was 'loco,'" and if Plaintiff had any problems with him Plaintiff should let Alldrin know, and Alldrin would move him. (Dkt. 23, p.7.) There is a dispute in the record over whether Alldrin said any of those things. However, the material issue here is not whether Williams was obnoxious; it is whether either Alldrin or Plaintiff knew that Williams was a physical threat to Plaintiff before the assault.

Defendant Alldrin declares that he "did not believe that Williams would assault [Plaintiff]." (Dkt 19-10, p.2.) There is no evidence in the record that Alldrin believed Williams would assault Plaintiff. Not even Plaintiff reported that he thought Williams would assault him. Rather, Plaintiff's only complaints about Williams were that Williams

**MEMORANDUM DECISION AND ORDER - 9**

was antisocial and belligerent. (Dkt. 37-13, p.2.)

Plaintiff and Williams remained free of any reported problems for 15 weeks. However, on June 2, 2010, Plaintiff describes Williams as verbally assaulting him Plaintiff "in a very belligerent manner" in their cell at about 5:00 a.m. (Dkt. 3, p.12.) When Defendants Fudge and Gehrke, Correctional Officers at ICI-O, arrived at the cell door and asked if everything was settled, Plaintiff "merely shrugged" and remained silent. (*Id.;* Dkt. 23, p.7.)

Defendants Fudge and Gehrke returned to Plaintiff's and Williams' cell about an hour after the verbal conflict and found both inmates asleep in their cell. (Dkt. 19-12, p.3.) At the end of Defendant Fudge's shift at 6:30 a.m., Defendant Fudge informed Defendant Alldrin about the verbal altercation, and reported that both inmates were now asleep and "the conflict appeared to have resolved." (*Id.*) Defendant Alldrin checked on Plaintiff and Williams before he left the PC Unit at 11:00 a.m., and similarly found both of them asleep in their cell. (Dkt. 19-10, p.3.)

About 10:30 a.m., Plaintiff turned in the following concern form to be delivered to Defendant Alldrin:

> "When I agreed to move to 205A so Jimison could have 207A, you warned me that the guy who would be my new cellie, Richard Williams, was impossible to get along with for very long. Well, I have had enough of his antisocial and belligerent behavior and I want to be moved A.S.A.P. I would like to check out of PC and go to C1 if possible. Please do not return a copy of this kite. If you will talk to me, please call me out of the unit so we can talk in private."

(Dkt. 37-13, p.2.) Plaintiff's concern form did not indicate that Plaintiff was afraid of

**MEMORANDUM DECISION AND ORDER - 10**

Williams or concerned that Williams might assault him. (Dkt. 19-10, p.3.) Because

Defendant Alldrin left the PC Unit at approximately 11:00 a.m., going offsite, and the

concern form was not delivered to him before he left, he did not receive the concern form

until June 3, 2010, the day after the assault. (*Id.*)

Importantly, Plaintiff did not verbally report that he perceived that he would be

attacked or was in imminent danger to *any* officer on duty between the hours of 5:00 a.m

and 9:30 p.m., when the assault occurred. (Dkt. 19-3, p.9.) Plaintiff may have many

reasons for doing so. However, the operative material issue on summary judgment is

whether any Defendant perceived that Williams would physically harm Plaintiff (either as

a result of Williams' past history or the earlier verbal altercation), and Plaintiff's failure to

report shows that Defendants did not know. The wording of the concern form also did not

put the receiving officer on notice that Plaintiff was in fear of physical harm, nor did

Plaintiff fear harm enough to verbally report it to anyone on duty between 5:00 a.m. and

9:30 p.m.

That evening, at approximately 9:35 p.m., Williams began destroying all of

Plaintiff's property and then beat Plaintiff with such force that Williams broke his own

hand and wrist by beating Plaintiff. (Dkt. 3, pp.13-14.) Plaintiff suffered cuts and bruises

on his forehead and ribs, and experienced moderate to slight pain for six months after the

assault. (*Id.*) Prior to Plaintiff's assault, there was no information in the inmate tracking

system suggesting any conflict existed between Plaintiff and Williams, nor had Plaintiff

submitted any written concern forms expressing any concern for his safety for being

**MEMORANDUM DECISION AND ORDER - 11**

housed in the same cell with Williams, or for being housed in Level 2 "with allegedly violent and predatory offenders." (Dkt. 19-3, pp.7-8.)

### C. *Discussion of Failure to Protect Claim*

To prevail on an Eighth Amendment "prison conditions" claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This is the "objective" element of the test. *Id*. at 829.

In addition, the inmate must show that prison officials were deliberately indifferent to a substantial risk of serious harm, which is the "subjective" element of the test. *Id.* at 828. Deliberate indifference exists when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Id.* at 838.

The United States Court of Appeals for the Ninth Circuit has explained that a showing that a prison official had a "sufficiently culpable state of mind" under *Farmer* "entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2006) (citing *Farmer*, 511 U.S. at 835). In *Hearns*, where a "series of planned attacks and religious-related violence" by the ruling Muslim group against other Muslims at the prison was "'longstanding, pervasive, [and] well-documented,'" the court held that the allegations in the complaint "were sufficient to raise an inference that the prison officials acted with deliberate

**MEMORANDUM DECISION AND ORDER - 12**

indifference, or knew that Hearns faced a substantial risk of serious harm and

'disregard[ed] that risk by failing to take reasonable measures to abate it.'" *Hearns*, 413

F.3d at 1041 (quoting *Farmer*, 511 U.S. at 847). *Hearns* is instructive, but not

procedurally on point because the issue there was whether the allegations of the

complaint failed to state a claim, and, here, the issue is whether Plaintiff has sufficient

admissible evidence to rebut Defendant's argument that no facts showing deliberate

indifference exist.

In *Berg v. Kincheloe*, 794 F.2d 457 (9th Cir. 1986), the Court explained

the subjective element of the test:

> The standard does not require that the guard or official believe to a
> moral certainty that one inmate intends to attack another at a given place at
> a time certain before that officer is obligated to take steps to prevent such an
> assault. But, on the other hand, he must have more than a mere suspicion
> that an attack will occur.

*Id*. at 459 (internal punctuation and citation omitted); *see also Glenn v. Berndt*, 289

F.Supp. 2d 1120 (D.C. Cal. 2003).

Applying the *Farmer* standard to this case, Plaintiff must establish that  he was

incarcerated in the ICI-O PC Unit under conditions posing a substantial risk of serious

harm to himself, and that Defendants were deliberately indifferent to such risk of serious

harm. Construing the evidence in a light most favorable to Plaintiff and for the reasons set

forth below, the Court concludes that the evidence in the record fails to satisfy either

element of the *Farmer* test.

As to the objective element of the *Farmer* test -- that Plaintiff was incarcerated

**MEMORANDUM DECISION AND ORDER - 13**

under conditions posing a substantial risk of serious harm -- Plaintiff makes broad allegations such as: "Many prisoners with histories of murder and assaults have been placed in PC units and many PC inmates have been involved in physical altercations every year" and "I personally have complained in writing about inmates who threaten and menace but ICI-O staff refused to remove them from Level 2 until they assaulted someone." (Dkt. 23, p.2.) If Plaintiff had provided the Court with specific evidence to support these alleged physical altercations or written complaints about threatening and menacing inmates who eventually assaulted another inmate, then perhaps a genuine issue of material fact would arise. Instead, Plaintiff included five affidavits from other ICI-O inmates and 16 offender concern forms that he has allegedly submitted to ICI-O staff, but none of these affidavits or concern forms suggest there was a substantial risk of serious harm toward Plaintiff prior to Williams assaulting him.

The five affidavits fail to raise a genuine issue of material fact as to the risk of serious harm to Plaintiff because: (1) the Affidavit of Calob S. Fairburn describes Inmate Fairburn being housed with two different cellmates over a two month period of time who were alleged members of the same gang that had put a hit on him at ISCI (prior to his transfer to the PC Unit), but Fairburn provides no dates or other facts as to whether these cellmates threatened or assaulted him, or how his cellmates otherwise created a substantial risk of serious harm to him or Plaintiff (Dkt. 23-2); (2) the Affidavit of Frank Boman describes how two different inmates allegedly assaulted Inmate Boman in Level 2 of the PC Unit on August 7, 2010, and he also makes additional broad statements about

**MEMORANDUM DECISION AND ORDER - 14**

other unnamed inmates who initiated physical altercations in the PC Unit and were not removed from the PC Unit. (Dkt. 23-3.) However, Inmate Boman's alleged assaults occurred *after* Plaintiff's assault, so his testimony is not relevant to the Court's determination of a substantial risk of serious harm *before* Plaintiff's assault, nor are Inmate Boman's generalized statements about unnamed inmates initiating fights in the PC Unit and still being housed there sufficient to raise a genuine issue of material fact in this case; and (3) the Affidavits of William Gray, Kenneth McDonald and Stanley Nebeker all provide testimony regarding the verbal altercation they heard between Williams and Plaintiff on the morning of the assault, but the fact that the verbal altercation occurred is not in dispute, and therefore the content of these Affidavits are not material to the Court's ruling.

As to the offender concern forms Plaintiff submitted, only three pre-date the assault on June 20, 2010, so the other thirteen concern forms are not relevant to Plaintiff's claim. (*See* Dkt. 23-7, pp.3-17.) In the earliest concern form dated December 2, 2008, Plaintiff claims that "an inmate rudely yelled at me that I was 'going to get fucked up' if I cause the whole tier to get locked down." (Dkt. 23-7, p.3.) Plaintiff does not identify the inmate by name, state that he is afraid for his safety, or ask to be moved out of Level 2. Rather, Plaintiff informs ICI-O staff that "group punishment for an individual's infraction is illegal in prisons" and if Plaintiff weren't a non-violent person, "I would never tolerate another inmate threatening me like happened today." (*Id.*) Plaintiff's report of a generalized threat toward him by an unnamed inmate does not demonstrate a substantial

**MEMORANDUM DECISION AND ORDER - 15**

risk of serious harm.

The next day, on December 3, 2008, Plaintiff submitted another concern form as a follow-up to a PC Review hearing he had with prison officials and stated: "I shared my anger and frustration at unjust, callous treatment at hands of IDOC staff" and queried "to whom can I discuss my frustration and anger?" (Dkt. 23-7, p.3.) Plaintiff's anger and frustration toward IDOC staff does not demonstrate a substantial risk of serious harm of another inmate toward Plaintiff.

Finally, the last concern form Plaintiff submitted prior to Williams' assault is dated June 22, 2009. Plaintiff states that "Chancé has been trying to bully me into insisting on moving out of the cell we're in just like Piro did when Chancé was his cellie. He's smart enough to not <u>directly</u> threaten me. . . " and Plaintiff mentions Chancé's "veiled threats" toward Plaintiff and another inmate, and asks IDOC staff "to do something." (Dkt. 23-7, p.4.) Although Plaintiff specifically identifies the inmate he is complaining of, Plaintiff admits Chancé did not directly threaten him, and he did not state that he felt afraid for his safety or ask to be moved away from this inmate. Once again, Plaintiff's complaint about veiled threats and his vague request to IDOC staff that "you've got to do something" fails to establish that Plaintiff was incarcerated in conditions posing a substantial risk of serious harm.

As to Defendants' argument that Plaintiff has not satisfied the objective element of the *Farmer* test, Defendants have provided IDOC records for all of the assaults that occurred in the PC Unit in the year prior to Plaintiff's assault. (*See* Dkts. 37-1 through 37-

**MEMORANDUM DECISION AND ORDER - 16**

12.) There were nine assaults in total, and only one of the assaults was classified as an aggravated battery with moderate injuries to the inmate who was attacked. Of the remaining eight assaults, four were reported to be mutual combat and the other four were minor physical altercations involving one inmate hitting, pushing or punching another inmate with minimal or no injuries resulting in such assaults. None of the IDOC records indicate, nor has Plaintiff established, that all of the attackers were inmates with underlying violent crimes, or that all of the victims were "vulnerable nonviolent PC inmates known to be particularly in need of protection from assault." (Dkt. 37, p.2.) The Court finds that the infrequency and individual circumstances of the inmate-on-inmate assaults in the PC Unit further undermine Plaintiff's contention that he was incarcerated in conditions posing a *substantial* risk of *serious* harm.

In addition, Plaintiff has not demonstrated that Defendants were aware of a substantial risk of serious harm by housing Plaintiff in the same cell as Williams. Defendants have submitted the Affidavits of various prison officials, including Terema Carlin, the ICI-O Warden, who explain the IDOC policy for reviewing and assigning an inmate to the PC Unit to ensure the safety of that inmate and the other PC inmates as well. Pursuant to this IDOC policy, the Restrictive Housing Placement Committee reviewed evidence such as Williams' disciplinary record, his willingness and ability to live with other offenders, and his classification. (*See* Dkt. 37-15, p.22.) Such evidence included the Reclassification Score Sheet completed in June 2009, which indicates Williams had not received any DORs in the preceding twelve months. Thus, Williams' placement into the

**MEMORANDUM DECISION AND ORDER - 17**

PC Unit was both reasonable and in compliance with IDOC policy.

Furthermore, Plaintiff has submitted no evidence to support his allegations that once Williams was assigned to the PC Unit, Plaintiff was at a substantial risk of being seriously harmed by Williams and Defendants were deliberately indifferent to that risk. During the six month time period Plaintiff and Williams were housed together in Level 2 of the PC Unit – and nearly four of those sixth months they were cellmates – Plaintiff did not submit a single concern form or speak to any ICI-O staff member about being threatened or harmed by Williams, or any other PC inmate for that matter. The prison's C-notes contain no such indication, and Plaintiff's repeated allegations to the contrary are unsupported and therefore without merit.

Prior to Williams' assault upon Plaintiff, the first and only conflict between these inmates occurred earlier that day when Williams started yelling at Plaintiff. When Defendants Fudge and Gehrke showed up at the cell to investigate the verbal altercation, Plaintiff said nothing. Instead of informing the staff that Plaintiff now felt threatened by Williams or feared for his safety, he simply shrugged his shoulders and remained silent. Defendants Fudge and Gehrke's initial response to and investigation of the verbal altercation was reasonable, as were the subsequent check-ins by prison staff who reported that Williams and Plaintiff were both sleeping in their cell.

If Plaintiff did not wish to make his fears known in front of Williams, he had all day and most of the evening in which to contact a prison official and verbally inform that official of his concern. This he did not do. And, although Plaintiff did submit a written

**MEMORANDUM DECISION AND ORDER - 18**

concern form to Defendant Alldrin later that day – who happened to be offsite and thus did not see the concern form until the next day – the contents of the concern form did not indicate Plaintiff felt threatened by or in imminent danger from Williams. Plaintiff merely stated that he had "had enough of [Williams'] antisocial and belligerent behavior and I want to be moved ASAP." (Dkt. 37-13, p.2.) Even if the concern form were timely received on the day of the attack, prison officials would have had to read a lot between the lines of Plaintiff's concern form to interpret Plaintiff's intolerance toward his cellmate's behavior as notice that Plaintiff felt threatened by or was seriously concerned about his safety. Prison officials cannot be deliberately indifferent toward a purported substantial risk of harm when Plaintiff fails to inform them of the risk, despite having numerous opportunities to do so.

Based on the undisputed evidence, Plaintiff has failed to establish a genuine issue of material fact regarding his Eighth Amendment failure to protect claim. The record does not support Plaintiff's contention that he was incarcerated under conditions posing a substantial risk of serious harm, nor has Plaintiff shown that Defendants were deliberately indifferent to such a risk of harm. Prison officials did not have even a "suspicion" that an attack would occur, and they need more than that to satisfy the subjective element set forth in *Farmer*. *See Berg,* 794 F.2d at 459. Accordingly, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's Eighth Amendment claim for failure to protect him from harm.

Because this conclusion disposes of all remaining claims against all remaining

**MEMORANDUM DECISION AND ORDER - 19**

Defendants, the Court need not address Defendants' other arguments in support of summary judgment. The claims that Defendants sued in their official capacities are not "persons" under 42 U.S.C. § 1983, that the Eleventh Amendment bars claims against individual IDOC Defendants being sued in their official capacities, that the theory of *respondeat superior* precludes supervisory liability for many of the Defendants, and that Defendants being sued in their individual capacities are entitled to qualified immunity are all now moot. In addition, the Court will dismiss the claims against all other Defendants in the Complaint against whom Plaintiff was not authorized to proceed for the reasons set forth in the Initial Review Order.

**2. Defendants' Motion to Strike (Dkt. 25), Plaintiff's Motion to Strike (Dkt. 29) and Plaintiff's Objection and Motion to Strike and Supporting Memorandum Affidavit (Dkt. 42)**

  **A.** *Standard of Law*

Federal Rule 56(c) governs the procedures that the parties must comply with to support or dispute a motion for summary judgment. *See* Fed. R. Civ. P. 56(c). Under Rule 56(c)(2), a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Id.* An affidavit is an acceptable form in which to present evidence in the summary judgment context. However, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Rule 56 makes clear then that only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(c). However, in determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

As to the parties filing motions to strike as a means of objecting to the evidence submitted in support of or against the pending Motion for Summary Judgment, the Advisory Committee Notes to the most recent amendments to Rule 56 provide that a Rule 56(c)(2) objection "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56 advisory committee's note (2010 Amendments). Motions to strike are limited to pleadings, which are defined by Federal Rule 7(a); affidavits and exhibits filed in support of, or in opposition to, a motion for summary judgment are not pleadings. *See Albertson v. Fremont County, Idaho*, 834 F. Supp.2d 1117, 1123 n.3 (D. Idaho 2011). Thus, the motions to strike filed in this case will be construed as objections to the materials filed by the opposing party.

**MEMORANDUM DECISION AND ORDER - 21**

### B. *Defendants' Motion to Strike*

On June 18, 2012, Defendants filed a Motion to Strike requesting that the Court strike portions of Plaintiff's responsive pleadings to Defendants' Motion for Summary Judgment. (Dkt. 25.) In particular, Defendants argue that portions of Plaintiff's Brief Opposing Defendants' Motion for Summary Judgment (Plaintiff's Response) (*see* Dkt. 23-1) and Statement of Disputed Facts (*see* Dkt. 23) "are replete with statements which do not cite to any materials in the record," or contain hearsay statements or are "unfounded statements which are not supported by admissible evidence." (Dkt. 25-1, p.5.) Defendants also request that the five affidavits accompanying Plaintiff's Response should be stricken "to the extent they lack foundation and/or personal knowledge, contain hearsay statements, are conclusory, contain irrelevant testimony, contain testimony whose prejudicial value outweighs the probative value, and contain expert testimony for which the affiant is not qualified to testify." (*Id.*, p.2.) Finally, Defendants contend that all of the exhibits to Plaintiff's Response should be stricken because of Plaintiff's failure to lay the proper foundation for their admission. (*Id.*)

Having carefully considered Defendants' broad swath of objections, the Court overrules all of the objections related to Plaintiff's Response and Statement of Disputed Facts. The Court is mindful of the Ninth Circuit's caution that district courts "should construe liberally motion papers and pleadings filed by *pro se* inmates and should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). Here, the majority of Plaintiff's Response and Statement of Disputed Facts are

MEMORANDUM DECISION AND ORDER - 22

comprised of statements based upon Plaintiff's personal knowledge of facts that would be admissible through his testimony at trial. In addition, Plaintiff's Response to the Motion to Strike was filed as a declaration under penalty of perjury, wherein Plaintiff attests that the statements were "true and correct to the best of his knowledge, understanding and belief." (Dkt. 27, p.5.)[1] To the extent the Court relied upon some of those statements in its decision to grant Defendants' Motion for Summary Judgment, the statements are admissible evidence and therefore Defendants' objections are overruled.

As to the five affidavits Plaintiff submitted in support of his opposition to the Motion for Summary Judgment, the Court reviewed the contents of each affidavit and as noted above, determined that none of the evidence therein was material to the Court's decision to grant Defendants' Motion for Summary Judgment. Accordingly, Defendants' objections are deemed moot.

Finally, Defendants' objection that Plaintiff's exhibits should be stricken for not having a proper foundation is overruled. The exhibits attached to Plaintiff's opposition are all offender concern forms he has purportedly submitted to ICI-O staff. Although they were not attached to an affidavit when they were initially filed with the Court, Plaintiff later filed his Response to the Motion to Strike as a declaration under penalty of perjury, and in it Plaintiff states that he "has personal knowledge [of all exhibits] . . . which support various allegations and claims made by Plaintiff in the Complaint. . . ." (Dkt. 27,

---

[1]Plaintiff's follow-up declaration under penalty of perjury obviates the need for the Court to give Plaintiff any opportunity to properly support or address the facts as provided in Federal Rule of Civil Procedure 56(e)(1).

**MEMORANDUM DECISION AND ORDER - 23**

p.5.) The Court finds that Plaintiff's belated attempt to lay a proper foundation for their admission, along with the minimal relevance these records provided in granting Defendant's Motion for Summary Judgment, weigh in favor of the Court overruling Defendants' objection.

### C. *Plaintiff's Motions to Strike*

On July 19, 2012, Plaintiff filed a Motion to Strike, seeking to strike all of the affidavits filed in support of Defendant's Motion for Summary Judgment (Dkt. 29), and then on February 22, 2013, Plaintiff filed an Objection and Motion to Strike and Supporting Memorandum and Affidavit (Dkt. 42), requesting that the Court strike the Supplemental Affidavit of Terema Carlin. Plaintiff argues that the original affidavits contain statements that are vague, conclusory, speculative, irrelevant, and/or misleading, or constitute hearsay. (Dkt. 29-1, pp. 3-16.) As to the Supplemental Affidavit of Terema Carlin, Plaintiff objects because it is untimely, contradicts statements in her previous affidavit, represents a lack of good faith, and contains hearsay, deceptive, prejudicial and conclusory statements not supported by the record. (Dkt. 42, p.2.)

In ruling on Defendants' Motion for Summary Judgment, the Court relied upon the affidavits of Defendants Carlin (including her Supplemental Affidavit), Fudge and Alldrin. The Court overrules all of Plaintiff's objections to these affidavits. The affiants' statements were made on personal knowledge, set out facts that would be admissible in evidence, and showed that the affiants were competent to testify on the matters stated therein. *See* Fed. R. Civ. P. 56(c)(4). In addition, none of the statements relied upon by

**MEMORANDUM DECISION AND ORDER - 24**

the Court constitute hearsay. As to the remaining affidavits, the Court reviewed the evidence provided therein but did not rely upon any of it in its summary judgment ruling. Plaintiff's objections are therefore moot.

Plaintiff also asks the Court to strike Defendant Carlin's Supplemental Affidavit, which clarified some of the additional discovery that Defendants were ordered to produce in the November 5, 2012 Order, and corrected some misstatements in Defendant Carlin's original affidavit, which she states were "based solely upon my memory and not a review of any records . . . . I recognize that I should have reviewed records to ensure the accuracy of my [original] statement. I take my inadvertent misstatement very seriously." (Dkt. 40, p.2.) Because Defendant Carlin's explanation about her misstatements appear to be the result of her own negligence or less-than-careful lawyering rather than bad faith, and because the Supplemental Affidavit actually is more helpful to Plaintiff's case than the first affidavit, it will not be stricken. However, Defendant Carlin and her lawyers should, at all times in the future, be diligent in providing sworn testimony that is based on a thorough review of all relevant evidence and not merely from memory.

### 3.  Plaintiff's Motion to Compel

Following Defendants' court-ordered production of documents in December 2012, Plaintiff filed a Motion to Compel on January 2, 2013, and requests production of the following supplemental documents in addition to those already produced by Defendants: (1) the names of the prisoners (that were redacted per the terms of the November 5, 2012 Order) in the inmate-on-inmate assault documents; (2) all DORS ever issued to these

**MEMORANDUM DECISION AND ORDER - 25**

prisoners; and (3) all classification and reclassification score sheets for each of these prisoners. (Dkt. 36.) As discussed above, the Court has already reviewed the records for the nine assaults which occurred in the relevant time period and determined that they did not create a triable issue of fact to defeat summary judgment. None of the supplemental documents requested would enable Plaintiff to alter the Court's decision to grant summary judgment; discovering the names of the prisoners involved in the nine assaults is not a material fact in this case and would run afoul of ICI-O's privacy concerns. Obtaining additional documentation regarding the disciplinary history of the inmates involved in the nine assaults – eight of which were deemed mutual combat or a minor fight with minimal or no injuries – likewise would fail to create a genuine issue that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. Accordingly, Plaintiff's Motion to Compel the production of additional documents will be denied.

## ORDER

**IT IS ORDERED:**

1.      Defendants' Motion for Summary Judgment (Dkt. 19) is **GRANTED**. All claims against all Defendants in the Complaint are dismissed with prejudice.

2.      Defendants' Motion to Strike (Dkt. 25) is **DENIED** as to Plaintiff's Brief Opposing Defendants' Motion for Summary Judgment (Dkt. 23-1), Statement of Disputed Facts (Dkt. 23), and all Exhibits attached thereto. (Dkt. 23-7.) Defendants' Motion to Strike (Dkt. 25) is **MOOT** as to Plaintiff's affidavits attached thereto. (Dkts. 23-2, 23-3,

**MEMORANDUM DECISION AND ORDER - 26**

23-4, 23-5, and 23-6.)

    3.    Plaintiff's Motion to Strike (Dkt. 29) is **DENIED** as to the Affidavit of Terema Carlin (Dkt. 19-3), the Affidavit of Kenneth Alldrin (Dkt. 19-10), and the Affidavit of Janet Fudge. (Dkt. 19-12.) Plaintiff's Motion to Strike (Dkt. 29) is **MOOT** as to the Affidavit of Amy Anderson (Dkt. 19-11), the Affidavit of Benjamin Gunn, Sr. (Dkt. 19-13), the Affidavit of Darcell Stammer (Dkt. 19-14), and the Affidavit of Brent Reinke. (Dkt. 19-15.)

    4.    Plaintiff's Motion to Compel Production of Supplemental Documents and Supporting Memorandum and Affidavit (Dkt. 36) is **DENIED**.

    5.    Plaintiff's Objection and Motion to Strike and Supporting Memorandum and Affidavit (Dkt. 42) is **DENIED**.

    6.    A separate Judgment will be entered by the Court.

    7.    The Clerk of the Court is directed to close this case.

DATED:  **March 28, 2013**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 27**